2001 SD 142

**Connie Cutler CHRISTIANS,
Plaintiff and Appellee,**

v.

**Michael Arlo CHRISTIANS, Defendant
and Appellant.**

No. 21543.

Supreme Court of South Dakota.

Argued March 20, 2001.

Reassigned Sept. 4, 2001.

Decided Dec. 5, 2001.

David R. Strait of Austin, Hinderaker, Hopper, Strait & Bratland, Watertown, South Dakota, Attorney for plaintiff and appellee.

Rick A. Ribstein of McCann, Ribstein & Hogan, Brookings, South Dakota, Attorney for defendant and appellant.

SABERS, Justice (on reassignment).

[¶ 1.] Connie Cutler Christians (Connie) was granted a divorce from her husband Michael Arlo Christians (Michael). Michael appeals raising nine issues. We affirm all issues, except Issue 5, which we remand for recalculation of child support to include alimony.

## FACTS

[¶ 2.] Connie and Michael were married on September 18, 1993 in Minnesota. They have one child, Cara, born December 19, 1995. At the time of trial, Connie was 31 years old and Michael was 37. Both Connie and Michael are in good health.

[¶ 3.] Michael is a graduate of South Dakota State University (SDSU) with a B.S. degree in Dairy Production. Michael has held various jobs over the length of the marriage, and, at the time of dissolution, he was making approximately $61,000 per year as a sales representative for Degussa Huls, a chemical manufacturer.

[¶ 4.] Connie is also a graduate of SDSU with a B.S. degree in Ag Business and Rural Sociology. After graduation, Connie worked at Cenex/Land O' Lakes beginning in 1991. She quit her job after she married Michael in 1993. In June of 1994, she started working at Norwest Bank in Watertown as a loan officer and earned approximately $28,000 annually. Soon after filing for divorce, she was fired from her position at Norwest Bank. She claims her firing was caused by Michael's misconduct.

[¶ 5.] Connie filed for divorce on March 26, 1999. She amended her complaint on October 6, 1999, to include numerous causes of action including a count of Intentional Infliction of Emotional Distress.

[¶ 6.] The trial was held on January 20, 25, and February 2, 2000. After hearing the evidence, the trial court: 1) granted Connie a divorce on the basis of extreme cruelty; 2) granted Connie custody of Cara with visitation by Michael pursuant to the court's expert, Dr. Clayborne; 3) divided the marital property; 4) established child support in the amount of $637.00 per month to be paid by Michael; 5) awarded Connie permanent alimony; 6) awarded Connie $8,000 in attorneys' fees and costs; 7) granted a permanent injunction, restraining Michael from disclosing confidential information of customers of the bank where Connie had worked; 8) directed that all exchanges for child visitation take place through the Family Visitation Center operated by the Woman's Resource Center in Watertown, South Dakota; 9) awarded Connie $20,000 for intentional infliction of emotional distress; and 10) assessed punitive damages against Michael in the amount of $7,000.

[¶ 7.] Michael appeals the following issues:

1. Whether the trial court erred in dividing the property.

2. Whether the trial court erred in granting permanent alimony.

3. Whether South Dakota law permits a cause of action for intentional infliction of emotional distress based on conduct which occurred after the filing for divorce, but prior to its completion, and if so, whether Connie established the required elements of intentional infliction of emotional distress.

4. Whether the trial court erred when it failed to consider the alimony award when calculating child support.

5. Whether the trial court adopted Dr. Clayborne's report as stipulated to by the parties.

6. Whether the trial court abused its discretion in granting Connie a divorce based on extreme cruelty.

7. Whether the trial court erred in granting punitive damages of $7,000 to Connie.

8. Whether the trial court erred in allowing Connie to file her proposed findings of fact and conclusions of law after the statutory deadline.

9. Whether the trial court abused its discretion in awarding Connie attorneys' fees and costs of $8,000.

## STANDARD OF REVIEW

[¶ 8.] It is well settled that the trial court has broad discretion with respect to property division and, absent an abuse of discretion, its judgment will not be set aside. *Caughron v. Caughron*, 418 N.W.2d 791, 792 (S.D.1988); *Tate v. Tate*, 394 N.W.2d 309, 311 (S.D.1986). "The term 'abuse of discretion' refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." *Paradeis v. Paradeis*, 461 N.W.2d 135, 137 (S.D.1990) (citing *Bradeen v. Bradeen*, 430 N.W.2d 87, 91 (S.D. 1988)). All of these issues are reviewed under the abuse of discretion standard.

[¶ 9.] **1. Whether the trial court erred in dividing the property.**

[¶ 10.] After calculating all real and personal property owned by Michael and Connie, the trial court determined the couple's net worth at $537,234.82. Included in this figure, the trial court found Connie's premarital net worth to be $19,425 and Michael's premarital net worth to be $277,700.56. After also subtracting a $14,890 line of credit, the court arrived at a marital estate of $254,999.26. This amount was equally divided between the parties with each receiving $127,499.63. Michael contends that his premarital net worth was much higher than that recognized by the trial court. Specifically, he asserts that the trial court undervalued the 320 acres of farmland he inherited.

[¶ 11.] At trial, Michael testified that the farmland, which he inherited prior to the marriage, was worth $229,000. Connie, on the other hand, offered evidence that the value of the farmland was $100,280.

[¶ 12.] This Court has noted: "[i]n making an equitable division of property, the trial court is not bound by any mathematical formula, but is to make an award on the basis of the material factors in the case, having due regard for equity and the circumstances of the parties." *Garnos v. Garnos*, 376 N.W.2d 571, 572–73 (S.D. 1985). Although a trial court is not required to accept either party's proposed valuation, the value must be within the range of evidence presented to the court. *Johnson v. Johnson*, 471 N.W.2d 156, 162 (S.D.1991); *Strickland v. Strickland*, 470 N.W.2d 832, 837 (S.D.1991); *Studt v. Studt*, 443 N.W.2d 639, 641 (S.D.1989).

[¶ 13.] The trial court determined the value of the farmland to be $120,000. This was within "the range of evidence." *See Johnson, supra; Strickland, supra; Studt, supra.* While the trial court did not wholly adopt the figures of either party, the court's final valuation of the farmland was well within its discretion and supported by the conflicting valuations. *Paradeis, supra.* "This represents another case where we are being asked to fine-tune the handiwork of those to whom the division of martial property has been entrusted. We refuse to do this without a stronger showing than is presented here." *Buseman v. Buseman*, 299 N.W.2d 807, 810 (S.D.1980). Therefore, we find no er-

ror.[1]

**[¶ 14.] 2. Whether the trial court erred in granting permanent alimony.**

[¶ 15.] The trial court granted Connie permanent alimony with the following distribution schedule: $1,300 the first month, decreasing $200 each month. Once the figure reached $300, the amount of alimony would remain at $300 per month until either party dies or if and when Connie remarries.

[¶ 16.] Factors considered in deciding alimony are: 1) length of the marriage; 2) respective earning capacity of the parties; 3) their respective age, health and physical condition; 4) their station in life or social standing; and 5) relative fault. *DeVries v. DeVries*, 519 N.W.2d 73, 77 (S.D.1994). Our review of the trial court's award of alimony is based on the abuse of discretion standard. *Id.*

[¶ 17.] The trial court took into account that the marriage lasted approximately six years. Over that time period, Connie contributed substantially to the couple's accumulation of wealth by being the primary caregiver to their daughter as well as maintaining certain assets while Michael was away on business. The court considered the age and health of the parties and determined that they were both of good health and found their physical condition to not affect their ability to earn a living. The court did, however, find that Michael's earning potential far exceeded that of Connie, as Michael was currently making $61,000 per year and Connie was unemployed.

[¶ 18.] Likewise, Michael was found to be at fault for the dissolution of the marriage. The record is replete with instances where Michael's treatment of Connie was less than respectful. As the trial court found, Michael attempted to control Connie's behavior regarding use of their vehicles, her job, social life, and especially with the spending of money. We have often emphasized that relative fault is an important factor in determining whether alimony is warranted. *Vander Pol v. Vander Pol*, 484 N.W.2d 522, 525 (S.D.1992); *Kanta v. Kanta*, 479 N.W.2d 505, 511 (S.D. 1991). Michael's fault for the dissolution of the marriage is clear.

[¶ 19.] A review of the factual findings entered by the trial court shows a consideration of all factors and its findings on this issue are supported by the record. *Evans v. Evans*, 1997 SD 16, ¶ 31, 559 N.W.2d 240, 247 (citation omitted). Thus, the permanent alimony award is affirmed.

**[¶ 20.] 3. Whether South Dakota law permits a cause of action for intentional infliction of emotional distress based on conduct which occurred after the filing for divorce, but prior to its completion, and if so, whether Connie established the required elements of intentional infliction of emotional distress.**

[¶ 21.] A claim for intentional infliction of emotional distress is a separate and

---

1. Likewise, it was not error for the trial court to give Michael credit for 280 out of the 320 originally inherited acres of farmland. All property may be divided, regardless of its title or origin. *Radigan v. Radigan*, 465 N.W.2d 483, 486 (S.D.1991). For Michael to claim reversible error for failing to receive only the value of 280 acres is without merit. There is no requirement that the trial court must give Michael credit for the 320 acres he inherited. Michael cannot "point to any authority which stands for the proposition that a court must give both divorcing parties credit for all their premarital assets in order to make an equitable division of the property." *Pellegrin v. Pellegrin*, 1998 SD 19, ¶ 19, 574 N.W.2d 644, 648. Because he is unable to show the trial court abused it discretion in its allocation of property for distribution, a remand is not warranted.

independent tort. In the divorce setting, we have made it clear that the conduct *leading to the dissolution* of marriage is not grounds for an intentional infliction of emotional distress claim. *Pickering v. Pickering,* 434 N.W.2d 758, 761 (S.D. 1989). Independent torts, however, are actionable.[2] In *Henry v. Henry,* this Court acknowledged "that a spouse can bring a civil suit for damages caused by tortious conduct to the other spouse." 534 N.W.2d 844, 846 (S.D.1995). *See also Gassman v. Gassman,* 296 N.W.2d 518, 522 (S.D.1980) (recognizing that a civil damage suit for a personal tort would have been a proper remedy); *Scotvold v. Scotvold,* 68 S.D. 53, 55, 298 N.W. 266, 269 (1941) (recognizing that the common-law rule barring a civil action against one's spouse had been abrogated by the legislature). Accordingly, after the grounds for divorce are established, a party should not be able to intentionally inflict wrongs on the other party to harass, exploit or embarrass.

[¶ 22.] In recognizing a claim for intentional infliction of emotional distress in this case, we are not injecting a tort recovery for intentional infliction of emotional distress into every divorce action. We are only providing a remedy to an aggrieved party, a remedy available to every other citizen of the state. "Proof under this tort must exceed a rigorous

benchmark." *Henry v. Henry,* 2000 SD 4, ¶ 6, 604 N.W.2d 285, 288. The conduct necessary to form intentional infliction of emotional distress "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d. (1965). That is exactly what the trial court found.

[¶ 23.] The elements for intentional infliction of emotional distress include:

(1) extreme and outrageous conduct by the defendant; (2) that the defendant intended to cause severe emotional distress; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress must result.

*French v. Dell Rapids Community Hospital, Inc.,* 432 N.W.2d 285, 289 (S.D.1989) (citing *Groseth Int'l, Inc. v. Tenneco,* 410 N.W.2d 159, 169 (S.D.1987)).

[¶ 24.] To recover the claimant must meet the necessary elements separate from her grounds for divorce. Connie's claim stems from Michael's conduct that occurred after filing for divorce. Michael's actions caused Connie extreme emotional distress and loss of employment. The trial court extensively considered the

---

2. SDCL 25-2-1 states that a "husband and wife contract toward each other obligations of mutual respect, fidelity and support." Significantly, individual property rights are not contracted away through marriage vows. SDCL 25-2-4 states that "neither husband nor wife has any interest in the property of the other excepting their respective rights for support as specifically provided by law." SDCL 25-2-10, in accord with Art. XXI, § 5, provides that each spouse has individual property rights.

A tort cause of action is clearly a property right. That very issue was addressed by this

Court in *Scotvold,* 68 S.D. at 55, 298 N.W. at 269.

We are unable to discern a basis for holding that a wife has a remedy against her husband for breach of contract or for invasion of property rights but is without remedy against him for a personal tort. Either the statute grants sweeping remedies to the wife as against her husband, or none. We think it intended to grant the wife rights and remedies as against the husband.

*Id.*

evidence supporting Connie's claim and specifically found:

> Michael's conduct during the pendency of the divorce action was extreme and outrageous—particularly his April 12, 1999, contact with Bev Morrison and his disclosure of financial records of bank customers. Some of his other actions (accusing Connie of child abuse, having [child] repeatedly examined by law enforcement, and repeatedly reporting child abuse to the Department of Social Services) could arguably be a genuine concern for [child] and a legitimate attempt to obtain custody in a divorce action. However, the repeated, excessive nature of these actions, when considered in the light of his entire course of conduct during the marriage, compels the conclusion that they, too, were extreme and outrageous.

[¶ 25.] Michael acted intentionally to cause Connie severe emotional distress.

> Michael's conduct did in fact cause Connie's distress. The court is aware that a divorce action, particularly one which is hard fought, will likely cause distress to the parties. However, Michael's actions exceeded anything which could be justified as part of the divorce action and Connie's stress also exceeded anything which could be attributed to the divorce action. Michael's reporting of bank customer financial records caused Connie to be reprimanded at work and caused her to question whether she would keep her job. Thereafter, Michael had his contact with Bev Morrison and continued his course of conduct against Connie. As a result, she became more distressed and her job performance slipped badly. Michael's conduct was a primary cause of Connie's discharge from the bank, which only increased her emotional distress.

The trial court did not grant damages for intentional infliction of emotional distress for conduct which caused the breakup of the marriage. Michael's conduct was intentionally hostile and designed to cause as much harm as possible. These actions, which extended over and above the grounds for divorce, and were intended to harm Connie, support the trial court's award of damages. We affirm.

[¶ 26.] **4. Whether the trial court erred when it failed to consider the alimony award when calculating child support.**

[¶ 27.] The trial court awarded child support in the amount of $637 to be paid by Michael per month. The court arrived at this amount by determining Michael's net monthly income to be $3,633 and Connie's net monthly income of $793, based upon full-time employment at the State minimum wage, as she was unemployed. After making the appropriate allowances and calculations, the court arrived at the $637 amount to be paid by Michael. Michael claims that the court erred by failing to take into account the amount of alimony received by Connie in her net monthly income per *Peterson v. Peterson*, 2000 SD 58, ¶ 9, 610 N.W.2d 69, 70–71. We agree.

[¶ 28.] In *Peterson*, we determined that alimony payments are deductible from the payor's income for child support purposes. *Id.* at ¶ 14. In recognizing so, we determined that alimony is considered "payments made on other support and maintenance orders." *Id.* at ¶ 16. *See also* SDCL 25–7–6.7(6). Thus, Connie's award of alimony should have been included in the calculation in determining her monthly net income for child support. *Peterson*, 2000 SD 58 at ¶ 16, 610 N.W.2d at 71. Therefore, we reverse this issue for the trial court to recalculate the child support award.

**[¶ 29.] 7. Whether the trial court erred in granting punitive damages of $7,000 to Connie.**

[¶ 30.] Punitive damages are awarded for the purpose of deterring the person "against whom they are awarded from repeating the offense and others from committing it." *Grynberg v. Citation Oil & Gas Corp.*, 1997 SD 121, ¶ 36, 573 N.W.2d 493, 504 (quoting *Bogue v. Gunderson*, 30 S.D. 1, 137 N.W. 595, 596 (1912)). In *Henry I*, this Court recognized that:

> Of significance is the right to recover for the intentional tort. Our law before today practiced a cruel paradox. Under the guise of promoting family harmony, it permitted the wife beater to practice his twisted frustrations secure in the knowledge that he was immune from civil action except for a divorce, and that any criminal penalty would ordinarily be a modest fine. If nothing else, the knowledge of a monetary judgment with punitive damages may stay such violence.

*Henry I*, 534 N.W.2d at 847 (quoting *Coffindaffer v. Coffindaffer*, 161 W.Va. 557, 244 S.E.2d 338, 343–44 (1978)).

[¶ 31.] This Court has set forth five factors for determining appropriate punitive damages. *Engels v. Ranger Bar, Inc.*, 2000 SD 1, ¶ 34, 604 N.W.2d 241, 247. They include: "(1) the amount allowed in compensatory damages; (2) the nature and enormity of the wrong; (3) the intent of the wrongdoer; (4) the wrongdoer's financial condition; and (5) all of the circumstances attend[ing] to the wrongdoer's actions." *Id.* (citing *Wangen v. Knudson*, 428 N.W.2d 242, 246 (S.D.1988)). The trial court properly applied these factors to the facts of this case. The trial court did not abuse its discretion in awarding Connie $7,000 in punitive damages.

[¶ 32.] We have considered the remaining issues raised by Michael and find them without merit and affirm the trial court.

[¶ 33.] We affirm all issues except for issue 4, which is remanded for recalculation of the child support award. We award Connie appellate attorneys' fees of $2,000.00 based on a review of the appropriate factors in *Malcolm v. Malcolm*, 365 N.W.2d 863, 866 (S.D.1985).

[¶ 34.] GILBERTSON, Chief Justice, concurs.

[¶ 35.] KONENKAMP, Justice, concurs specially.

[¶ 36.] AMUNDSON, Justice, and MILLER, Retired Chief Justice, concur in part and dissent in part.

KONENKAMP, Justice (concurring specially).

[¶ 37.] It might appear that our decision today begins a new coinage, but in truth, our holding only mints from an old die. This Court abrogated interspousal tort immunity sixty years ago. *Scotvold v. Scotvold*, 68 S.D. 53, 298 N.W. 266 (1941); *see also Aus v. Carper*, 82 S.D. 568, 151 N.W.2d 611 (1967). Here, the husband's tortious acts fall under the classic delineation of intentional infliction of emotional distress. His conduct was ostensibly designed to cause the very result he sought. His effort to malign his wife's job integrity at the bank was a maliciously planned offensive. He threatened that before he was done, she would lose her job. She did.

[¶ 38.] Public accusations of child abuse, with repeated examinations of the child by law enforcement, all were intended to harm his wife. He clearly meant to destroy not only whatever remained of the marital relationship but also a mother's relationship with her child. *See Bhama v. Bhama*, 169 Mich.App. 73, 425 N.W.2d

733, 734 (1988). These were not impulsive, isolated acts occurring in a moment of anger or frustration. They were part of a prolonged policy of sabotage, seeking to destroy his wife's future. As the trial court found, it was "the repeated, excessive nature" of his actions "considered in light of his entire course of conduct during the marriage" that warranted the conclusion that his acts were an extreme outrage. No spouse should have to endure such abuse for the sake of a marriage.[3] Thus, although I reject as artificial a distinction between acts occurring before and after commencement of the divorce action, I join in the Court's recognition of the tort of intentional infliction of emotional distress in the marital context.

[¶ 39.] Many questions about combining these tort actions with divorces await future resolution. What thresholds and sanctions, for instance, must courts impose to prevent meritless claims from congesting and polluting the domestic relations process? Should courts routinely allow these torts to be tried at the same time as the divorce action, or should they be tried separately? What are the preclusive effects of waiting to bring this tort claim until after the divorce? In combining torts with domestic relations, can lawyers use contingent fee agreements in family law matters, or should they have separate fee agreements with the client? These are just a few of the many issues yet to be resolved.

## A.

### Strict Standards

[¶ 40.] Trial courts must employ the strict legal standards of the Restatement formulation to distinguish intentional infliction of emotional distress from the often sordid, and sadly familiar, deeds of marital misconduct. Certainly, people are entitled to no less dignity in the marriage relationship than they are in other types of human interactions. Yet a marriage calls on physical and emotional resources rarely needed in other less intimate unions. Even a successful and thriving marriage can bring difficulty and disappointment. Because a marriage commitment demands so much and dedicates so much, it is difficult to overvalue the sense of loss the destruction of a marriage can beget. Marital partners unable to overcome their failings may seek dissolution of the relationship, but neither spouse will ordinarily gain monetary damages from the other merely by virtue of these failings. *See, e.g., Wiener v. Wiener,* 84 A.D.2d 814, 444 N.Y.S.2d 130, 131 (1981).

[¶ 41.] To ensure that these tort claims are not conceived out of petty spite or as leverage for concessions on divorce issues, trial courts, not juries, must sift out unmeritorious suits.[4] Whether conduct is so extreme and outrageous as to permit recovery is a question of law. Restatement (Second) of Torts § 46 cmt h. Only when reasonable minds may differ does the fact finder decide whether, in a particular case, the conduct was sufficiently extreme and outrageous to result in liability. *Id.* Thus, as with many other legal questions, the Restatement requires the judge to act as a gatekeeper in these cases. *Id.*

[¶ 42.] The extreme outrage committed by the offending spouse must far exceed

---

3. The tort of intentional infliction of emotional distress "is especially appropriate for a continuing pattern of domestic abuse." Douglas D. Scherer, *Tort Remedies for Victims of Domestic Abuse,* 43 S.C.L.Rev. 543, 544 (1992).

4. One reason why the Florida Supreme Court refused to abrogate interspousal immunity was to prevent spouses from using tort suits to coerce more favorable settlements. *Hill v. Hill,* 415 So.2d 20, 24 (Fla.1982).

the bitter but common emotional torments accompanying a deteriorating marriage. Liability will not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* at cmt. d. The injured spouse must prove not only outrageous conduct but also conduct committed with the very purpose of, or the reckless disregard for, inflicting severe emotional distress on the injured spouse. Establishing both prongs requires more than a showing of mere negligence. Emotional distress includes all highly unpleasant mental reactions, such as fright, humiliation, embarrassment, anger, worry, and nausea. *Id.* at cmt. j. The law intercedes only when the distress is so severe that no reasonable person should be expected to endure it. *Id.*

[¶ 43.] These tort actions should not be used as a method to augment divorce awards. Trial courts must scrupulously forestall double recoveries.[5] A spouse should not reap tort damages on the same misconduct that generated an alimony award. To avoid a double recovery, a court should factor the alimony awarded in the divorce action when considering damages. On the other hand, in the tort action, an award to one spouse from the other should not add to the marital estate, making the tort award "self-offsetting." *See* Barbara H. Young, *Interspousal Torts and Divorce: Problems, Policies, Procedures,* 27 J. Fam. L. 489, 511 (1989).

[¶ 44.] I share in the dissent's concern that we may see these tort claims combined routinely with divorce actions. It bears stressing, therefore, that if a court dismisses such a claim because it was frivolously or maliciously brought, then the court must order the offending party to pay part or all of the expenses incurred by the defense, including reasonable attorneys' fees. SDCL 15–17–51. The language of this statute is mandatory. SDCL 2–14–2.1. Furthermore, courts should sanction attorneys who regularly bring or assist in bringing meritless tort claims in unison with divorce actions, as authorized by SDCL 15–6–11(a)–(d).

### B.
### Joinder and Preclusion

[¶ 45.] In this case, the circuit court joined the divorce and tort actions in the same trial. This is permissible, but not mandatory. Circuit courts have general jurisdiction to hear all civil actions. S.D.Const. art. V § 1. Trial courts should carefully consider in each case whether to hear the tort and the divorce in the same trial. To avoid prejudice and maintain efficiency, courts have the discretion to order separate trials in these proceedings. SDCL 15–6–42(b). In many instances, a joinder of both actions will run contrary to considerations of public policy. *Stuart v. Stuart,* 143 Wis.2d 347, 421 N.W.2d 505, 508 (1988). When a divorce is brought on irreconcilable differences, joinder of an intentional tort claim defeats the legislative intent in enacting no-fault divorce. Tort actions seek to compensate the injured and sometimes to punish the wrongdoer; divorce actions aim to provide for support, divide marital property, and restore the parties to unmarried status. A tort claim may include facts irrelevant to divorce issues, numerous witnesses, and other parties, such as joint tortfeasors. Combining tort claims with a divorce action may unduly lengthen and complicate a trial and result in delayed child custody and support

---

5. In *Belz v. Belz,* both a jury and the divorce court awarded the wife monetary compensation on the husband's fraud in depriving her of an interest in community property. 667 S.W.2d 240 (Tex.Ct.App.1984). The *Belz* court reversed a part of the divorce award because the wife had already been compensated in the jury award.

rulings. *Id.* Obviously, if a jury trial is demanded, the court will have to separate the trials.

[¶ 46.] On the other hand, counsel must be aware that these matters are subject to the principles of preclusion through res judicata and estoppel. Res judicata consists of two preclusion concepts: issue preclusion and claim preclusion. *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Issue preclusion forecloses relitigation of matters tried and decided. Restatement (Second) of Judgments §§ 24, 27. Claim preclusion forecloses litigation of matters never litigated, but that should have been asserted in a prior action. *Lee v. Rapid City Area Sch. Dist.*, 526 N.W.2d 738, 740 (S.D.1995) (citations omitted). Estoppel may also preclude a later tort action. *See generally Gesinger v. Gesinger*, 531 N.W.2d 17, 21 (S.D.1995).

[¶ 47.] South Dakota is not a pure no-fault divorce state. *See* SDCL 25–4–2. If a divorce trial implicates matters of fault, such as "extreme cruelty," then res judicata may preclude a later tort claim. Restatement (Second) of Judgments § 24. If the divorce proceeds on a no-fault basis, i.e. irreconcilable differences, then res judicata or estoppel may not bar a later tort suit. *See Henriksen v. Cameron*, 622 A.2d 1135 (Me.1993). There is a split of authority on this question. In *Tevis v. Tevis*, the New Jersey Supreme Court barred a tort suit by an ex-spouse because the "single controversy" doctrine and efficiency necessitated that the tort claim be resolved during the divorce suit. 79 N.J. 422, 400 A.2d 1189 (1979). On the other hand, courts in Colorado, Utah, and Arizona came to the opposite conclusion. *Simmons v. Simmons*, 773 P.2d 602 (Colo.Ct.App.1988); *Windauer v. O'Connor*, 107 Ariz. 267, 485 P.2d 1157 (1971); *Walther v. Walther*, 709 P.2d 387 (Utah 1985). An Ohio appeals

court, in *Koepke v. Koepke*, ruled that the concern for judicial economy "does not outweigh the fact that a domestic relations forum is not the proper forum in which to litigate a tort claim." 52 Ohio App.3d 47, 556 N.E.2d 1198, 1200 (1989).

[¶ 48.] Contingency fees are common in tort actions. But the South Dakota Rules of Professional Conduct prohibit "any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or upon the amount of alimony or support, or property settlement in lieu thereof...." *See* SDCL 16–18 (Rule 1.5(d)(1)). In *Simmons, supra*, the court considered the problem of apportioning attorneys' fees to be an additional policy reason for rejecting joinder. Combining divorce and tort claims presents difficulties in allotting time and fees in client billings. What part of the award results from the divorce claim as distinct from the intentional infliction of emotional distress claim?

[¶ 49.] I concur on the other issues in the majority opinion.

AMUNDSON, Justice (concurring in part and dissenting in part).

[¶ 50.] I respectfully dissent on issue three, which is whether we should permit a cause of action for intentional infliction of emotional distress based on conduct occurring prior to the completion of a divorce, and if so, whether the elements for intentional infliction of emotional distress have been met. Based on my dissent regarding issue three, I do not believe we must address issue seven concerning punitive damages. I concur with the majority on the other issues of this case.

[¶ 51.] This Court has addressed the inclusion of an intentional infliction of emotional distress claim in a divorce action on two prior occasions. In *Pickering*, this Court held that a spouse couldn't sue the

other spouse for conduct *arising out of* the dissolution of the marriage. 434 N.W.2d 758 (emphasis added). In *Henry I,* this Court held that a spouse could sue the other spouse for conduct *after* the divorce is final. 534 N.W.2d 844 (emphasis added). We recognized in *Pickering* that the emotionally charged setting displayed in most divorces would almost always result in emotional distress; therefore it follows that a claim for emotional distress could be made in every divorce case. We further stated in *Pickering* that "[w]e do not believe that the law should provide a basis for such interfamilial warfare." 434 N.W.2d at 762 (citations omitted).

[¶ 52.] In *Henry I,* however, we recognized that one should not be able to conduct himself or herself with impunity from suit at the expense of a former spouse. 534 N.W.2d at 846–47. In other words, one would not be deterred from emotionally harming a former spouse, knowing that he or she cannot be sued. In *Henry I,* we stated that "SDCL 25–4–1 provides that the effect of a divorce judgment 'is to restore the parties to the state of unmarried persons.'" *Id.* at 846. As such, allowing a suit to go forward based on post-divorce conduct is allowable as the parties are no longer considered married. A couple is not considered divorced in the eyes of the law upon the filing of divorce. Rather, they are not legally divorced until the divorce decree is signed and filed by the trial court. SDCL 25–4–1.

[¶ 53.] It is important to note that in the *Pickering* type situation, the party suffering emotional distress can point out the aggressor's conduct when determining fault, and alimony may be awarded to the aggrieved party. In such a case, the court has the authority to hold an individual in contempt. SDCL 15–20–19. Under the trial court's broad contempt powers, it could find the party in contempt and/or

grant terms to the aggrieved party. In the *Henry I* type situation, however, the party suffering emotional distress is no longer protected by the court's jurisdiction if alimony was not originally awarded. *See Hershey v. Hershey,* 467 N.W.2d 484, 489 (S.D.1991) (stating modification of alimony is a supplementary proceeding to original divorce suit).

[¶ 54.] The record in this case only discloses a trial wherein the divorce and tort claim were combined for hearing. It is impossible to discern from this record what evidence was presented to support each cause of action. Therefore, meaningful appellate review of the record regarding whether or not there is a viable post-divorce claim is impossible. Therefore, I would remand for further proceedings and would avoid making a determination on whether the elements for emotional distress have been met. Because the majority held that the elements have been met, however, I respond to their contentions with some concern.

[¶ 55.] The elements for intentional infliction of emotional distress include: "(1) extreme and outrageous conduct by the defendant; (2) that the defendant intended to cause severe emotional distress; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress must result." *French v. Dell Rapids Community Hosp., Inc.,* 432 N.W.2d 285, 289 (S.D.1988) (citing *Groseth Int'l, Inc. v. Tenneco,* 410 N.W.2d 159 (S.D.1987)).

[¶ 56.] Element one, extreme and outrageous conduct, requires "conduct exceeding all bounds usually tolerated by decent society and which is of a nature especially calculated to cause, and does cause, mental distress of a very serious kind." *Stene v. State Farm Mut. Auto.,* 1998 SD 95, ¶ 32, 583 N.W.2d 399, 404 (citations omitted). The conduct required

to support a claim of intentional infliction of emotional distress "must be so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citations omitted).

[¶ 57.] Connie argues that many of Michael's actions amounted to extreme and outrageous conduct, including: telling Connie's co-worker and friend that Connie had forged a $35 check when Connie had, in fact, deposited it in their joint checking account; accusing Connie of having a girlfriend or boyfriend; accusing Connie of stealing money from him; stating that Connie foolishly spent money; accusing Connie of taking out life insurance on him with the intent of later killing him; telling bank customers from Connie's bank of employment that Connie had disclosed personal information about them; reporting Connie to Child Protection three times for investigation of abuse after finding bruises on their daughter, in addition to an array of other vindictive acts.

[¶ 58.] While Michael's actions were definitely far from benevolent, these facts would not cause an average member of the community to "exclaim, 'Outrageous!'"[6] Offensive words and actions are not uncommon between feuding spouses. Furthermore, "even when the conduct of feuding spouses is not particularly unusual, high emotions can readily cause an offended spouse to view the other's conduct as 'extreme and outrageous.'" *Hakkila v. Hakkila,* 112 N.M. 172, 812 P.2d 1320, 1324 (N.M.App.1991) (holding that various insults and outbursts during a marriage were insufficient to prove intentional infliction of emotional distress). While Michael's actions may have been "childish, irresponsible, and inconsiderate ... it is doubtful whether his conduct constituted a sufficient basis upon which liability could be imposed, on the plaintiff's theory of the case." *Hassing v. Wortman,* 214 Neb. 154, 333 N.W.2d 765, 767 (1983) (holding that a plaintiff failed to provide adequate evidence to support a verdict for intentional infliction of emotional distress). Thus, element one requiring extreme and outrageous conduct was not proven.

[¶ 59.] Furthermore, the record does not show that Connie proved the fourth element required for intentional infliction of emotional distress, which is *severe* emotional distress resulting from the defendant's conduct. *See French,* 432 N.W.2d at 289 (discussing the elements for intentional infliction of emotional distress). Although physical symptoms are not required to prove severe emotional distress in South Dakota, the plaintiff must provide some type of evidence adequate to prove that severe emotional distress does, in fact, exist. *See Stene,* 1998 SD 95 at ¶ 30, 583 N.W.2d at 404 (indicating that a "manifestation of physical symptoms" is required for negligent infliction of emotional distress, but not for intentional infliction of emotional distress).[7] Here, whether demonstrated by physical symptoms or not, the severity of Connie's distress could have

---

6. Restatement (Second) of Torts § 46, cmt. d (1965). The Restatement acknowledges that liability "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* The facts must be such that "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.*

7. This Court has previously stated:

As to intentional torts, this [C]ourt has held, [T]hat recovery can be had for mental pain, though no physical injury results, when the following elements are present: the act causing the anguish was done intentionally, the act was unreasonable and the actor should have recognized it as likely to result in emotional distress. *Chisum v. Behrens,* 283 N.W.2d 235 (S.D.1979); *First National Bank of Jacksonville v. Bragdon,* 84 S.D. 89, 167 N.W.2d 381 (1969). *See also, Gross v.*

been proven with expert testimony from a psychiatric expert, or it could simply have been proven by lay witness testimony. *See Uebelacker v. Cincom Sys., Inc.,* 48 Ohio App.3d 268, 549 N.E.2d 1210, 1220 (1988) (citation omitted) (stating that expert opinions may be used to show severe emotional distress, but they are not "indispensable," as lay persons may testify to significant changes in the plaintiffs emotional well being).

[¶ 60.]  In *Hubbard v. United Press International, Inc.,* the Minnesota Supreme Court analyzed whether the plaintiff had adequately substantiated his claim for intentional infliction of emotional distress. 330 N.W.2d 428, 440 (Minn.1983). In *Hubbard* the plaintiff testified that he had been depressed and physically ill in terms of vomiting and a skin rash, as well as high blood pressure. *See id.* The plaintiff, however, never skipped work for these conditions, nor did he claim worker's compensation or visit a doctor.  The court noted that "evidence as to Hubbard's injuries is conspicuously absent from the record." *Id.* Thus, the court held that the evidence was insufficient to prove intentional infliction of emotional distress.

[¶ 61.]  Much like in *Hubbard,* Connie failed to present evidence supporting her claim for intentional infliction of emotional distress.  Only Connie and one other person testified on the topic, and neither witness proved the claim.  Connie testified

that she suffered from back problems and had a nerve problem in her hand.  She further testified that a doctor in Aberdeen thinks that "maybe" these symptoms are stress induced.  Connie also stated that she cries a lot and that she lost her job because of Michael's actions.  Aside from Connie's own testimony about her emotional distress, the other witness on the topic was Bev Morrison, Connie's friend and co-worker.  Bev stated only that Connie displayed signs of stress and that Connie was worried about losing her job. Neither Connie's nor Bev's testimony, however, adequately proves that Connie suffered from *severe* emotional distress. The symptoms described do not appear to be more than the ordinary stresses of divorce.

[¶ 62.]  Importantly, the *Hubbard* court acknowledged that trial courts must carefully scrutinize all of the plaintiff's evidence concerning the cause and severity of alleged claims of emotional distress. *See id.* n. 9 (citation omitted).  Such scrutiny is required in order to avoid spurious claims for emotional distress. *See id.*  This Court, too, should use careful scrutiny when analyzing whether severe distress has been proven.  Without such scrutiny, burdensome litigation may become commonplace within the South Dakota courts and groundless claims for the tort will find their way into courtrooms more easily, thereby burdening judicial economy. *See*

---

*United States,* 723 F.2d 609 (8th Cir.1983); *Gross v. United States,* 508 F.Supp. 1085 (D.S.D.1981).  It has also been said of this tort that 'there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.' W. Prosser, Handbook of the Law of Torts § 12 (4th ed.1971). *Wright v. Coca Cola Bottling Co.,* 414 N.W.2d 608, 609 (S.D.1987) *quoting, Ruple v. Brooks,* 352 N.W.2d 652, 654 (S.D. 1984).  The evidence must show extreme emotional distress.  'The law intervenes

only where the distress inflicted is so severe that no reasonable man could be expected to endure it.'  Restatement (Second) of Torts § 46, Comment j (1965). *See also, Bethards v. Shivvers, Inc.,* 355 N.W.2d 39 (Iowa 1984).
*Groseth,* 440 N.W.2d at 280 (receded from by *Tibke v. McDougall,* 479 N.W.2d 898 (S.D. 1992) on other grounds).  Just as in *Groseth,* a review of the evidence in this case leads to only one conclusion on the issue of intentional infliction of emotional distress.  The only conclusion is that the evidence was insufficient to establish the claim.

*Hakkila,* 812 P.2d at 1324 (recognizing that the scope of the tort of intentional infliction of emotional distress should be very limited in the marital context).

[¶ 63.] The record is void of any evidence that Connie suffered emotional distress severe enough to validate recovery for emotional distress. She could have presented medical testimony of any counseling she obtained, but she did not. She could have presented adequate lay witness testimony proving severe emotional distress, but again, she did not. She should have presented evidence that Michael was, in fact, the cause for the lost job claim, but she did not. Therefore, Connie clearly failed to provide sufficient evidence to support the claim for intentional infliction of emotional distress.

[¶ 64.] Finally, after reading the testimony offered at trial, the record is unclear as to what testimony goes with what cause of action. At a minimum, the convoluted testimony evidenced in this record only supports our decision that the two causes of action need their own forum. As a practical matter, the posture of this case makes it difficult to conduct a meaningful appellate review. Without distinct facts providing the basis for a particular cause of action, this Court must sift through the entire record and guess as to what the trial court relies upon to determine whether the trial court was within its discretion. In order to conduct a meaningful review, the tort and divorce action should be litigated separately from one another.

[¶ 65.] A trial for divorce and a tort claim should be bifurcated. The trial court should have bifurcated Connie's claim of Intentional Infliction of Emotional Distress from her divorce claim. While this Court is mindful of the notion of judicial economy, "this concern does not outweigh the fact that a domestic relations forum is not the proper forum in which to litigate a tort claim." *Koepke v. Koepke,* 52 Ohio App.3d 47, 556 N.E.2d 1198, 1200 (1989); *see also Heacock v. Heacock,* 402 Mass. 21, 520 N.E.2d 151, 153 (1988) (stating "a tort action is not based on the same underlying claims as an action for divorce"); *Slansky v. Slansky,* 150 Vt. 438, 553 A.2d 152, 154 (1988) (finding divorce and tort are separate causes of action).

[¶ 66.] The objectives of a tort claim are inconsistent from those sought in a divorce action. *Koepke, supra* at 1199. "The purpose of a divorce action is to dissolve the marital relationship and effect a legal separation of man and wife, while a tort action is brought to recover compensation for injuries suffered as a result of a civil wrong." *Id.* In a tort action damages are recoverable, whereas in a divorce, damages are not available. Moreover, unlike a tort action, one is not entitled to a jury trial in a divorce action. *See generally, Fox v. Burden,* 1999 SD 154, 603 N.W.2d 916. Because the objectives of each cause of action are incompatible, they should not be tried together.

[¶ 67.] Based on the precedent established for this case and the scanty evidence in the record for this generous tort award, it would probably constitute legal malpractice if an attorney failed to file a claim for intentional infliction of emotional distress in all new domestic disputes. This will more than likely fall within what is commonly referred to as "opening the flood gates" in domestic relations law for tort claims. Therefore, I would have at least remanded back for a separate and fair trial on this newly embraced domestic relations tort, under which even "Mr. Wonderful" (Michael) is entitled to under our law.

[¶ 68.] MILLER, Retired Chief Justice, joins this writing.